UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHAEL HARRELL,

        Plaintiff,

                                                      Case Number 04-10072-BC
v.                                                       Honorable David M. Lawson

METROPOLITAN LIFE INSURANCE COMPANY,

        Defendant.

_____/

### OPINION AND ORDER DENYING DEFENDANT'S MOTION TO AFFIRM PLAN ADMINISTRATOR'S DECISION, GRANTING PLAINTIFF'S MOTION TO REVERSE PLAN ADMINISTRATOR'S DECISION, AND GRANTING DEFENDANT'S MOTION TO STRIKE

Terri Harrell, plaintiff Michael Harrell's wife, was killed in a car crash on September 3, 2003. She was the driver of one of the vehicles involved in the accident, and at the time her blood alcohol content exceeded the legal limit allowed by Michigan law. Michael Harrell, as an employee of the General Motors Corporation, participated in an employee benefit plan through which he purchased from defendant Metropolitan Life Insurance Company (MetLife) personal accident insurance that covered his wife and dependent children. MetLife refused to pay the death benefit under that insurance policy because it claimed that the exclusion from coverage of accidents cause by "self-inflicted injuries" excused its obligation to pay. It reasoned that ingesting alcohol constituted a self-inflicted injury, which contributed to the accident and resulting death of the covered person. The plaintiff commenced this action pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), and the parties have filed cross motions on the administrative record. The Court heard oral argument on March 16, 2005 and now holds that the arbitrary and capricious standard of review applies in this case, and under that

standard the defendant wrongfully refused to pay the death benefit to the plaintiff under the personal accident policy. The Court, therefore, will grant the plaintiff's motion to reverse the decision of the plan administrator and deny the defendant's motion to affirm the plan administrator.

I.

The fatal car accident occurred in Burton, Michigan and the facts are largely undisputed. In the early hours of September 3, 2003, Terri Harrell, the plaintiff's wife, left her home with the family dog to fill her 2003 Chevrolet Blazer with gasoline. Shortly before 2:00 a.m., Mrs. Harrell departed the gas station and traveled southbound on Genesee Road, a two lane street in Burton. At the time, Genesee Road was dry and traffic was light. The weather conditions were similarly unremarkable: it was approximately fifty-six degrees Fahrenheit with calm winds and a visibility range of nine miles.

At 1:53 a.m., Mrs. Harrell's Blazer veered across the center line and struck an oncoming vehicle. Jordan Andrews drove the vehicle that Mrs. Harrell struck and witnessed the ensuing accident. In his statement to police, Mr. Andrews related that

> his vehicle came into contact with Mrs. Harrell's vehicle and she continued S/B on Genesee. He stated he made a U-turn to follow the vehicle at which time he noticed her vehicle spinning out of control and come [sic] to rest at a telephone pole. R/O asked Mr. Andrews how fast he thinks Mrs. Harrell's vehicle was traveling and he stated approximately 80 mph.

AR 228. Bill Harris, another witness, reported the accident to police; paramedics and police arrived at the scene at approximately 2:07 a.m. and found no signs of life in Mrs. Harrell. She was pronounced dead on arrival at the Hurley Medical Center. According to the autopsy, she died from multiple internal injuries sustained as result of the crash.

After police officers arrived at the scene, they began an investigation, which culminated in a series of reports. The officers, however, reached contradictory conclusions as to whether alcohol played a role in the collision. Under the driver condition section of his accident report, officer Whitman checked the "no" box next to the alcohol subheading. AR 220. Officer Steve Henry, however, apparently believed that alcohol was involved and checked "yes" in the same part of his report. AR 219. A state police laboratory report later confirmed that Mrs. Harrell's blood alcohol content was above Michigan's legal limit. That report revealed Mrs. Harrell had 0.17 grams of alcohol per 100 milliliters of blood, and 0.11 grams of alcohol per sixty-seven milliliters of urine.

According to plaintiff Michael Harrell, Terri Harrell regularly drank alcohol and had been drinking that evening. He explained:

> Up until the time of her death my wife was a regular alcohol drinker. She would drink every day and she would drive nearly every day yet she always got home safely. To my knowledge she has never been in any type of accident where alcohol was involved. On the night she was killed I saw that she had been drinking before she left the house. I don't believe she drank any more that night than usual. She didn't look or act drunk or tipsy to me. She had to drink an awful lot to look drunk or tipsy, she had a high tolerance for alcohol.

AR 223.

At the time of the accident, the plaintiff worked for General Motors Corporation as a salaried employee. As a spouse of a salaried employee, the plaintiff's wife was covered by General Motors Life and Disability Benefits Program for Salaried Employees. Defendant MetLife administered this benefit plan. The plan provided for two types of insurance: Dependent Group Life Insurance (DGLI) and Personal Accident Insurance (PAI). On September 23, 2003, the plaintiff filed a claim under both policies. Thereafter, the plaintiff was paid $100,000 as the designated beneficiary under the DGLI policy.

However, unlike DGLI that is payable regardless of the cause of death, PAI benefits are subject to certain limitations. The plan provides in relevant part:

> 4.12(j) Payment of Benefits
> If, while insured for Personal Accident Insurance, an Employee, spouse/partner or Dependent Child sustains accidental bodily injuries, and within one year thereafter shall have suffered loss of life or any other loss set fourth in subsection (f), as a direct result of such bodily injuries independently of all other causes, the Carrier shall pay the benefit specified for such Losses. . . .
> . . .
>  (h)   Exclusions
>        In no case shall payment be made for any loss which is contributed to or caused, wholly or partly, directly, or indirectly, by:
> . . .
>        (5) suicide, attempted suicide or self-inflicted injury while sane or insane;

AR 103-104, 105. A summary of PAI benefits was also provided to salaried employees. The plan summary states:

> *Your Personal Accident Insurance*
> Benefits are payable to your beneficiary or beneficiaries if you should die as a result of a covered accident while insured for personal accident insurance. If you do not name a beneficiary or beneficiaries, any proceeds will be paid to the beneficiary or beneficiaries designated for your basic life insurance.
>
> Benefits will be payable to you in the event of your accidental dismemberment or because of any covered accidental loss or losses sustained by your eligible spouse/partner or dependent child(ren). Benefits are only payable if you, your spouse, or dependent child(ren) sustain accidental bodily injury and suffer a loss within one year of the accident; provided the loss was not the result partly or wholly due to causes stipulated in the plan. Certain exclusions are listed below.
> . . .
> ■ suicide, attempted suicide or intentionally self-inflicted wounds while sane or insane. . . .

AR 181.

In a letter dated November 20, 2003, MetLife denied the plaintiff's claim for PAI benefits. The letter stated:

-4-

> We have carefully evaluated your request for payment of Salaried Personal Accident Insurance Dependent coverage for the above referenced insured. For the reasons detailed below, we regret to inform you that we must deny your claim
> . . .
> As you know, you have enrolled for Personal Accident Insurance Dependent coverage as a participant in the General Motors Salaried Plan. This is a voluntary coverage paid for by the insured; the benefit is payable if an accident is the sole cause of death. However on page 113 in the Summary Plan Description dated January 2003 . . . states that "benefits are only payable if . . .your spouse . . . sustain[s] an accidental bodily injury and suffer[s] a loss within one year of the accident; provided the loss was not the result partly or wholly due to cause stipulated in the plan. Certain exclusions are listed below:.....intentionally self-inflicted injury. . . .["]
>       Mrs. Harrell was killed as a result of a motor vehicle crash when her vehicle left the road and came to rest against a telephone pole. The toxicology report indicated that her blood alcohol level was .17%. In the state of Michigan, a driver is considered legally intoxicated and incapable of operating a motor vehicle if the blood alcohol level is .10% or higher. This is because alcohol impairs the drinker's judgment and physical and mental reactions.
>       Therefore, based on this information now in file, we have no alternative but to deny your claim for Personal Accident Insurance Dependent coverage as the voluntary consumption of alcohol constitutes intentionally self-inflicted injuries under the General Motors Plan.

AR at 199.

> On December 16, 2003, the plaintiff appealed MetLife's initial denial. The plaintiff insisted:
>
> The claim for accidental insurance benefits regarding my wife's death was improperly denied. I think you have all of the documents about her accident, but you should know a few things about my wife.
>       Up until the time of her death my wife was a regular alcohol drinker. She would drink every day and she would drive nearly every day yet she always got home safely. To my knowledge she has never been in any type of accident where alcohol was involved. On the night she was killed I saw that she had been drinking before she left the house. I don't believe she drank any more that night than usual. She didn't look or act drunk or tipsy to me. She had to drink an awful lot to look drunk or tipsy, she had a high tolerance for alcohol. On the night she was killed she left the house with the dog and went I think to the gas station which she had done many times before. Evidently the accident happened on the way back home.
>       I guess what I am saying is that, for my wife, up until the time of the accident there was nothing at all unusual about that day. She had done the same thing hundreds of times before with no problem. That is why I don't believe my wife's death was intentionally self inflicted.

AR 197. On January 7, 2004, MetLife denied the plaintiff's claim upon reconsideration. Using the same language and reasoning found in its initial denial, MetLife added: "[t]he dangers of drinking and driving are sufficiently well known. . . . We regret to inform you that our original decision to deny your claim remains unchanged." AR 195.

On February 18, 2004, the plaintiff filed suit in the Bay County, Michigan circuit court to recover PAI benefits. On March 23, 2004, the defendant removed the action to this Court based on ERISA's preemption of state law. On August 11, 2004, the plaintiff filed a statement of procedural challenge asserting that this case is properly analyzed under a *de novo* standard of review, to which the defendant responded. On October 29, 2004, the parties filed cross motions on the administrative record.

II.

The plaintiff challenges the denial of PAI benefits under section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to [him] under the terms of [his] plan, to enforce [his] rights under the terms of the plan, or to clarify [his] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "As a general principle of ERISA law, federal courts review a plan administrator's denial of benefits de novo, 'unless the benefit plan gives the plan administrator discretionary authority to determine eligibility or to construe the terms of the plan.'" *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595(6th Cir. 2001)(quoting *Wilkens v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 613 (6th Cir. 1998)). The arbitrary and capricious standard of review is therefore appropriate when the ERISA plan provides a clear grant of discretion to the plan administrator and the decision being appealed was made in compliance with plan procedures. *Id.* at 595, 597.

There can be little doubt that the plan at issue here contains a discretionary grant of authority to the plan administrator. The plan states:

> The program Administrator expressly reserves the right to construe, interpret and apply the terms of this Program. . . . The Carrier also shall have discretionary authority to interpret the terms of the Program and to determine eligibility and entitlement to the Program benefits in accordance with the terms of the Program. Any interpretation or determination made by the Program Administrator, pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

AR 25-26. The Sixth Circuit has found this language to confer discretion to the plan administrator and trigger the arbitrary and capricious standard of review. *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979 (6th Cir. 1991).

The plaintiff does not take issue with the proposition that the plan administrator's determination that Terri Harrell's death was the result of a self-inflicted injury should be reviewed under an arbitrary and capricious standard. However, defense counsel have advanced additional arguments in their pleadings and brief that the car crash was not an "accident" because Mrs. Harrell either actually expected or reasonably should have expected the ultimate result of the car crash and her death when she chose to drive after drinking alcohol. That post hoc justification for denying benefits, the plaintiff argues, should be subject to the *de novo* standard of review because it was not a determination made by the plan administrator.

In a sense, the plaintiff's argument is tautological: the Court cannot deferentially "review" a decision that the plan administrator never made in the first place. But the argument also implies a different issue, that is, whether the denial of benefits can be justified by new arguments made by counsel that augment the plan administrator's rationale. That practice has been discouraged by the Sixth Circuit, with good reason:

> [I]t strikes us as problematic to, on one hand, recognize an administrator's discretion to interpret a plan by applying a deferential "arbitrary and capricious" standard of review, yet, on the other hand, allow the administrator to "shore up" a decision after-the-fact by testifying as to the "true" basis for the decision after the matter is in litigation, possible deficiencies in the decision are identified, and an attorney is consulted to defend the decision by developing creative post hoc arguments that can survive deferential review. The concerns inherent in this scenario are even more pronounced where, as here, the administrator has a financial incentive to deny benefits.

*University Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 849 n.7 (6th Cir. 2000).

Based on the language in the plan documents and the clear precedent, the Court is convinced that the arbitrary and capricious standard of review applies in this case to the plan administrator's decision to deny benefits according to the rationale stated in the administrative record. The Sixth Circuit has repeatedly held that the district court's review of a denial of benefits is limited to the evidence contained in the administrative record. *See, e.g., Jones v. Metropolitan Life Insurance*, 385 F.3d 654, 660 (6th Cir. 2004) (noting "when reviewing an administrator's denial of benefits pursuant to an ERISA plan, both the district court and this court may typically review only evidence contained in the administrative record."); *Wilkens*, 150 F.3d at 613 (same). Under that standard, a plan administrator's decision will be upheld if "it is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). Substantial evidence supports an administrator's decision if the evidence is "rational in light of the plan's provisions." *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Therefore, the Court must determine if the administrator's finding that Terri Harrell's death was the result of a self-inflicted injury is supported by substantial evidence. Defense counsel's alternate arguments will be considered only to the extent that they bear on the plan administrator's stated rationale.

III.

MetLife's denial of PAI benefits was based on its conclusion that Terri Harrell's death was the result of one the following excluded causes listed in the PAI policy: "suicide, attempted suicide or intentionally self-inflicted injury while sane or insane." AR 199. The defendant's stated rationale for applying this exclusion is that ingestion of alcohol "impairs the drinker's judgment and physical and mental reactions," *ibid.*, Mrs. Harrell apparently voluntarily drank alcohol before she drove her car, and, according to the appeal denial letter, "[t]he dangers of drinking and driving are sufficiently well known." AR 195. Although the plaintiff suggested at oral argument that there is conflicting evidence whether alcohol played a role in the accident, that argument has little effect on the issues presented for several reasons: the fact that the reports of the two officers conflicted on whether alcohol ingestion contributed to the accident does not undermine the plan administrator's decision to accept the version that it did; the document interpreting the accident reports was not part of the administrative record and cannot be considered by the Court; and the plan administrator's choice of two competing versions of the facts would not be arbitrary when the version adopted is supported by substantial evidence, even if the other version is also supported by the record. Rather, accepting the conclusion that Mrs. Harrell's death resulted at least in part by her drunken driving, the Court must decide whether the plan administrator's conclusion that the death was caused by "suicide, attempted suicide or intentionally self-inflicted injury" is "rational in light of the plan's provisions." *Smith*, 129 F.3d at 863.

In this matter, as in many such cases, "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). However, the terms "suicide," "attempted suicide," and

"intentionally self-inflicted injury" are not defined in the plan. Under the arbitrary and capricious standard, the plan administrator has the authority to interpret those terms. "Discretion to interpret a plan, however, does not include the authority to add eligibility requirements." *Ibid.* Thus, an administrator acts arbitrarily and capriciously when its interpretation adds requirements not found in the benefit plan or is unsupported by federal common law. *Jones*, 385 F.3d at 661; *University Hosp. of Cleveland*, 202 F.3d at 849 (reversing the denial of benefits under an arbitrary and capricious standard when, after "reviewing the plain language of the Plan," the court found that the administrator "exceeded its power to interpret the Plan, and instead has effectively rewritten it").

"Suicide" is generally understood to mean "[t]he or an act of taking one's own life, self-murder." *Oxford English Dictionary* (2d ed. 1989). It requires intentionality, since dying accidently by one's own hand is not considered "suicide." *See Hines v. Prudential Ins. Co. of America*, 357 F.2d 726, 729 (6th Cir. 1966) (upholding verdict in favor of life insurance beneficiary where "[t]he insured died as a result of violent means under such circumstances that were not wholly inconsistent with the theory of accident and we cannot say that all probabilities pointed to suicide. Nor can we say that the circumstances of the insured's death excluded all inferences other than that he intentionally took his own life"). MetLife does not seriously contend in this case that Terri Harrell intended to kill herself or attempted to do so. However, it does contend that she intentionally inflicted an injury upon herself by engaging in risky behavior: drunken driving.

The Court does not believe that equating the voluntary partaking in risky behavior with an intent to injury one's self is reasonable in light of the plan's provisions. Condoning such a construction would violate a cardinal rule of interpretation of ERISA plans, that "federal common law – from pre-*Erie* diversity cases to present day ERISA cases – focuses upon the expectations and

-10-

intentions of the insured." *Jones*, 385 F.3d at 664. A fair reading of the policy does not allow the interpretation that MetLife urges upon this Court. In fact, the section of the plan that includes the self-inflicted injury exclusion contains other exclusions, such as attempting to commit an assault, using drugs contrary to medical advice, stunt flying, and acting as a test pilot of an aircraft. *See* AR at 104. Excluding these activities – all arguably risky behaviors – would not be necessary if the self-inflicted-injury exclusion reasonably could be read to apply to all risky behavior.

The point was made by the Court of Appeals for the Second Circuit in *Critchlow v. First UNUM Life Ins. Co. of America*, 378 F.3d 246 (2d Cir. 2004). In that case, the plan administrator denied a death benefit to a beneficiary whose decedent died after engaging in autoerotic asphyxiation, relying on the self-inflicted-injury exclusion. Applying a *de novo* standard of review, the court reversed, stating:

> Although the district court emphasized that the practice of autoerotic asphyxiation is "risk[y]," . . . and UNUM argues that "it was unreasonable for Mr. Critchlow to believe that autoerotic asphyxiation did not present a risk of serious injury or death" . . . , the language of the Policy provision relied on by UNUM does not exclude activities that are simply hazardous. Such activities as cliff rappelling, rock climbing, and sky-diving are dangerous activities; and sometimes the precautions taken prove to be insufficient, and the result is death. . . . [T]he effect sought by the practice of autoerotic asphyxiation is a temporary effect that, absent an accident, is not injurious; and injury resulting from that practice is unintended. We thus see no differences between engaging in autoerotic asphyxiation and engaging in hazardous extreme-sport activities insofar as the coverage provided by the UNUM Policy is concerned. Given the language of the exclusion at issue here, it is not sufficient merely that a serious risk was willingly undertaken, so long as injury was not intended and, objectively, was not likely to occur.

*Id.* at 262-63.

The Eighth Circuit recently rejected the argument that a drunken driver's death was excluded from an ERISA-regulated insurance policy under the self-inflicted-injury exclusion, applying an

arbitrary and capricious review standard. *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994 (8th Cir. 2005) (en banc). Addressing that specific argument, the court stated:

> The most natural reading of the exclusion for injuries contributed to by "intentionally self-inflicted injury, suicide, or attempted suicide" does not include injuries that were unintended by the participant, but which were contributed to by alcohol intoxication. . . . One rarely thinks of a drunk driver who arrives home safely as an "injured" party, and to define drinking to the point of intoxication as an "intentionally self-inflicted injury, suicide, or attempted suicide" is at least a "startling construction."

*Id.* at 1004 (citations omitted).

This Court agrees with the reasoning of the Second and Eighth Circuits and holds that it is not reasonable to read the self-inflicted-injury exclusion in MetLife's plan to include unintended injuries that result from voluntarily engaging in risky behavior. To do so would require reading additional requirements into the plan. Of course, risky behavior – especially that which could result in injury to third persons – ought not to be encouraged, and the Court does not condone it. Likewise, MetLife is not obliged to provide coverage for a drunken driver's own death in its PAI policy, and a specific exclusion would achieve that result. But there is no evidence in the administrative record that Terri Harrell intended to inflict an injury upon herself, and refusing to pay the death benefit to her widower on the basis that she did so intend is arbitrary and capricious.

Counsel for the defendant argue that the PAI benefit was denied properly because the decedent did not die from an "accident." They cite other cases from district courts in this circuit in which the denial of benefits to survivors of drunken drivers was approved under ERISA plans, such as *Nelson v. Sun Life*, 962 F. Supp. 1010 (W.D. Mich. 1997); *Miller v. Auto-Alliance Int'l, Inc.,* 953 F. Supp. 172 (E.D. Mich. 1997); and *Fowler v. Metropolitan Life Ins. Co.*, 938 F. Supp. 476, 480 (W.D. Tenn. 1996). In those cases, unlike the one before the Court, the plan administrators

determined that the deaths were not accidental because they were reasonably foreseeable. That is not a basis used by the plan administrator in this case, and therefore it cannot serve as a justification upon review. *University Hosp. of Cleveland*, 202 F.3d at 849 n.7.

Even if that issue were properly before the Court, there is no published Sixth Circuit precedent that requires the result urged by the defendant. In *Jones v. Metropolitan Life Ins. Co.*, 382 F.3d at 664-65, the court discussed the competing interpretations of the term "accident" without adopting a version:

> Some of these cases adhere to the accidental means versus accidental results distinction, but hold that an injury caused by an unintended and unexpected mishap during the course of an intentional activity is caused by accident. Other cases reject the accidental means versus accidental results distinction and hold that an injury is accidental if it is neither subjectively expected nor objectively foreseeable.... Jones presented to the administrator evidence that may pass either test.

*Id.* at 664-64 (footnotes and citations omitted). Courts applying the latter, narrower definition usually refer to the formulation set forth by the First Circuit in *Wickman v. Northwestern Ins. Co.* 908 F.2d 1077 (1st Cir. 1990). In that case, the court was called upon to determine whether the decedent's death was "accidental," where he was seen standing on the outer side of a guard rail on a vehicle bridge and plunged forty feet to the train tracks below. Entertaining the possibility that the deceased voluntarily climbed onto the guardrail and inadvertently fell, the court "delve[d] into the metaphysical conundrum of what is an accident," answering the question "what level of expectation is necessary for an act to constitute an accident; whether an intentional act proximately resulting in injury or only the ultimate injury itself must be accidental." *Id.* at 1084-85.

In attempting to define the term, the court rejected the distinction between unintended acts and unintended results, opting rather for a more practical definition that began with "the reasonable expectations of the insured when the policy was purchased [as] the proper starting point for a

-13-

determination of whether an injury was accidental under its terms." *Id.* at 1088. The court then prescribed both a subjective and an objective component to the definition. The court stated that once it was determined that the insured did not intend the harm that befell him, "the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable." *Ibid.* That determination, in turn, "should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." *Ibid.* "In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as *highly likely to occur* as a result of the insured's intentional conduct." *Ibid.* (emphasis added).

Courts that have applied that test to conclude that drunken drivers who killed themselves in car crashes did not suffer "accidental" deaths either have espoused the notion that death or serious injury is the inevitable result of such conduct, *see, e.g. Fowler*, 938 F. Supp. at 480 (stating that "the hazards of drinking and driving are widely known and widely publicized. It is clearly foreseeable that driving while intoxicated may result in death or bodily harm"); or have confounded the "highly likely to occur" test with a "reasonably foreseeable" standard. *See Walker v. Metropolitan Life Ins. Co.*, 24 F. Supp. 2d 775, 781 (E.D. Mich. 1997) (observing that "[t]he hazards of driving while intoxicated are well-known. The public is reminded daily of the risks of driving while intoxicated both in warnings from the media and in motor vehicle and criminal laws"). In the case of the former, statistics do not seem to bear out the inevitability of death flowing ineluctably from drunken driving. *See King*, 414 F.3d at 998 (noting that the panel opinion cited "statistical evidence that drunk driving deaths constitute less than one percent of the number of people arrested for drunk driving" and that "such 'long-shot chances' of death by drunk driving failed to satisfy the *Wickman*

test"). Certainly there is no such evidence in the administrative record in this case. To the contrary, the only evidence is that the decedent had a high tolerance for alcohol and she made the trip to the gas station several times after consuming alcohol without incident.

Conduct that increases the risk of dire results does not make those results inevitable, as the *Wickman* court would require for a determination that an injury is not "accidental." Diluting that requirement to allow denial of benefits when a bad result is "reasonably foreseeable" undermines a common conception of "accidental injuries," and therefore could violate ERISA's requirement that benefit plans be "written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a). As the court explained in *King v. Hartford Ins. Co.*:

> [A] "reasonably foreseeable" standard is quite broad; if all "reasonably foreseeable" injuries are excluded from coverage, then the definition of accident may frustrate the legitimate expectations of plan participants, for insurance presumably is acquired to protect against injuries that are in some sense foreseeable.

*King*, 414 F.3d at 1002. An interpretation by a plan administrator of a benefit plan that does not focus, at least in some measure, "upon the expectations and intentions of the insured," but rather adds eligibility requirements, is not a reasonable interpretation under an arbitrary and capricious standard of review. *Jones*, 385 F.3d at 664-64.

There is no evidence in this record that the automobile accident was inevitable or even "highly likely to occur" "taking into account [Mrs. Harrell]'s personal characteristics and experiences." *Wickman*, 908 F.2d at 1088. Defense counsels' post hoc justification for the benefit denial based on the claim that no "accident" occurred is unavailing.

IV.

The Court finds that the denial of benefits is not reasonably based on the plan's provisions and is not supported by substantial evidence. Rather, the evidence in the administrative record establishes without contradiction that Terri Harrell's death was accidental within the meaning of the plan, and the defendant wrongfully refused to pay PAI benefits to the plaintiff.

Accordingly, it is **ORDERED** that the plaintiff's motion to reverse the denial of personal accident benefits [dkt # 15] is **GRANTED**.

It is further **ORDERED** that the defendant's motion for judgment affirming the plan administrator [dkt # 14] is **DENIED**.

It is further **ORDERED** that the defendant's motion to strike material that was not included in the administrative record [dkt #20] is **GRANTED**.

                                        s/David M. Lawson
                                        DAVID M. LAWSON
                                        United States District Judge

Dated: November 29, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 29, 2005.

                              s/Tracy A. Jacobs
                              TRACY A. JACOBS